UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RESTORATION SPECIALISTS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04 C 3629 |
| | ) | |
| FIRST SPECIALTY INSURANCE CORP., | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On June 29, 2003, a porch collapsed at an apartment on the north side of Chicago, Illinois, killing 13 people and injuring dozens of others. The tragic accident resulted in a number of lawsuits against the companies that owned and managed the property, Plaintiff Restoration Specialists, LLC ("Restoration") and L.G. Properties, LLC, and their alleged agents and employees (collectively, the "Underlying Lawsuits"). Restoration tendered a claim for indemnification and defense to its insurer, Defendant First Specialty Insurance Corporation ("First Specialty"). First Specialty formally recognized that its policy covered the tendered claims against Restoration and L.G. Properties on July 15, 2003. By September 2003, First Specialty also agreed to provide a defense to all of Restoration's and L.G. Properties' named agents and employees, with the exception of George Koutroumbis, the individual hired by Restoration and L.G. Properties to construct the porch.

In the action before this court, Restoration seeks a declaratory judgment recognizing First Specialty's obligation to defend Mr. Koutroumbis and estopping the insurance company from asserting any policy defenses to coverage. Restoration filed its case in the Circuit Court of Cook County on April 15, 2004. First Specialty removed the case to federal court based on diversity jurisdiction, 28 U.S.C. § 1332. Restoration has now moved for summary judgment, arguing that First Specialty has an unquestioned duty to defend Mr. Koutroumbis and has refused to do so in bad faith. Restoration also seeks sanctions under the Illinois statute that authorizes such an award

for an insurer's bad-faith refusal to defend, 215 ILCS 5/155. First Specialty opposes both motions and seeks a stay of this proceeding pending resolution of the Underlying Lawsuits. For the reasons set forth below, the motion for a stay is denied, the motion for summary judgment is granted in part and denied in part, and the motion for sanctions is denied without prejudice.

## FACTUAL BACKGROUND[1]

On June 29, 2003, the back porch at 713 W. Wrightwood Street (the "Property") collapsed, killing 13 individuals and injuring dozens of others. (Plaintiff's Local Rule 56.1(a) Statement (hereinafter, "Pl.'s 56.1") ¶ 7.) The building is owned and managed by Restoration, an Illinois limited liability corporation, and L.G. Properties.[2] Restoration's members include Illinois residents Philip J. Pappas ("Pappas"), who also serves as President of L.G. Properties, Michael Aufrecht, and James Pappas.[3] (Amended Notice of Removal ¶¶ 4, 5.) Approximately two weeks prior to the collapse, on June 13, 2003, First Specialty, a Missouri insurance corporation with its principal place of business in Overland Park, Kansas, issued a general liability policy covering the premises at the Property, including the porch. (Id. ¶ 6; Pl.'s 56.1 ¶ 6.) The policy defined the "insured" as

[1]     The parties have filed numerous motions to strike, including Defendant's motion to strike the affidavit of Laurie Burgess; Plaintiff's motion to strike portions of the affidavit of Dan Vance relating to settlement negotiations (Docket No. 36); Plaintiff's motion to strike unsupported statements of fact from Defendant's response brief; Plaintiff's motion to strike the affidavit of Ronald G. Musto; Plaintiff's motion to strike the affidavit of Dana Shay; and Plaintiff's motion to strike the affidavit of Dan Vance. On June 14, 2005, Plaintiff withdrew those portions of its motions to strike based upon conflicting statements provided by Defendant's witnesses. The court agrees that the Vance affidavit must be stricken to the extent it describes the parties' settlement positions. To the extent the court addresses any other statement or affidavit in this opinion, the related motion to strike is denied. To the extent a statement or affidavit is not addressed, the motion to strike is denied as moot.

[2]     The parties have not provided information regarding the corporate structure of L.G. Properties, LLC, but L.G. Properties, Co. is an Illinois corporation owned and operated by Philip Pappas. Neither party has addressed the question of whether L.G. Properties, LLC is a necessary party to this litigation. If it is, the court will expect the parties to provide information concerning the membership of L.G., and the state(s) in which its members are citizens.

[3]     The record does not identify the exact nature of the relationship between Philip Pappas, James Pappas, and Michael Aufrecht.

Restoration Specialists, LLC, as well as its "'employees,' . . . but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business . . ." (Ex. A to Complaint, at 7.)  On the day of the accident, Pappas informed First Specialty of the potential claims that could arise, and indicated that the "[i]nsured would like to have input on the attorney [hired to defend against any resulting lawsuits]."  (Id. ¶ 10; General Liability Notice of Occurrence/Claim dated 6/29/03, Ex. 1 to Defendant First Specialty Insurance Corporation's Statement of Material Facts (hereinafter "Def.'s 56.1").)

## A.    The Underlying Lawsuits

Within days of the porch collapse, a number of plaintiffs filed lawsuits, naming as defendants Restoration; L.G. Properties; Philip Pappas; Jack Emery, the Property manager for Restoration and L.G. Properties; and George Koutroumbis.[4]  The lawsuits allege that the defendants acted negligently and/or willfully and wantonly in constructing and maintaining the porch. The lawsuits also variously allege that Restoration and L.G. Properties "hired" Koutroumbis to construct and install the porch and/or that Koutroumbis was an "agent" of L.G. Properties.  (Id. ¶ 12; Group Ex. B to Complaint, Exs. 1-31.)

Less than one week after the accident, plaintiffs began filing emergency motions that required immediate legal investigation and response.  (Id. ¶ 13.)  According to Restoration, because First Specialty failed to provide a defense team to respond to these pressing legal matters, Mr. Pappas hired his own team of attorneys to respond to emergency motions, as well as investigators to identify and interview witnesses and engineers and other professionals to assess the accident scene.  (Id. ¶¶ 14, 15.)  Among the attorneys was Laurie M. Burgess of Katz, Friedman, Eagle, Eisenstein & Johnson, whom Mr. Pappas retained to protect Restoration's rights under its various insurance policies.  (Letter from L. Burgess to L. Wright of 7/9/03, Ex. 2(a) to

---

[4]    To date, 39 lawsuits, including 11 wrongful death cases, have been filed in the underlying tort litigation.  (Pl.'s 56.1 ¶ 51.)

Def.'s 56.1.) Mr. Pappas claims that "[i]n responding to the immediate demands of this accident, the lawyers [and] professionals that were hired to handle the immediate aftermath of the accident, approximately $145,000 in costs and legal fees was incurred." (Pappas Aff. ¶ 7; Pl.'s 56.1 ¶ 16.)

First Speciality maintains that it retained attorney Mitchell Orpett of Tribler, Orpett & Meyer, P.C. to defend Restoration, L.G. Properties, and Mr. Pappas as of June 30, 2003. (Def.'s 56.1 ¶ 2; Musto Aff., Ex. 2 to Def.'s 56.1, ¶ 6.) Mr. Pappas, however, demanded input into the selection of legal counsel and swiftly rejected attorney Orpett. (Letter from L. Burgess to L. Wright of 7/9/03, Ex. 2(a) to Def.'s 56.1; Letter from R. McGregor to M. Aufrecht of 7/2/03, Ex. 4 to Def.'s 56.1; Letter from M. Orpett to P. Farina of 7/7/03, Ex. 5 to Def.'s 56.1.) Instead, Mr. Pappas requested that First Specialty agree to retain attorney William Johnson of Bell & Johnson. (Letter from L. Burgess to L. Wright of 7/9/03, Ex. 2(a) to Def.'s 56.1.)

**B.     First Specialty's July 15, 2003 Letter**

On July 15, 2003, Ronald G. Musto, an Assistant Claims Manager with First Specialty, sent Laurie Burgess a letter approving Restoration's request to retain Mr. Johnson and the Johnson & Bell firm to represent Restoration with respect to lawsuits arising from the porch collapse. (Letter from R. Musto to L. Burgess of 7/15/03, Ex. 2(b) to Def.'s 56.1.) Mr. Musto indicated that Mr. Johnson's rate "is higher than we would customarily pay defense counsel of comparable skill and experience in Chicago for similar work," but nonetheless agreed to pay that rate. (*Id.* at 6.) In the letter, Mr. Musto also confirmed that

> [s]ubject to the terms and conditions of the First Specialty policy (and also subject to the confirmation of L.G. Properties' status as property manager), First Specialty will provide a defense to Restoration Specialists, Philip Pappas, and L.G. Properties for the McKinnell Suit[5] and subsequent claims filed by or on behalf of those persons killed or injured in the porch collapse.

---

[5]     Jean Ware, Administrator of the Estate of Kelly McKinnell, filed the first lawsuit against Restoration and its agents and employees on July 7, 2003, No. 03 L 8084 D. (Ex. B1 to Complaint.)

(*Id.* at 6.) Mr. Musto acknowledged that the McKinnell Suit "alleges that prior to June 29, 2003, the porch had been constructed and installed by George Koutroumbis, an agent of L.G. Properties," but there is no discussion regarding Koutroumbis' representation. (*Id.* at 2.)

Mr. Musto's July 15, 2003 letter finally recognized that "[g]iven the potential number of claimants who may file actions as a result of the porch collapse, it appears likely that the total amount of damages will exceed the per occurrence limit of the First Specialty Policy. Accordingly, the potential exists for a judgment that exceeds the available $1 million policy limit." (Letter from R. Musto to L. Burgess of 7/15/03, Ex. 2(b) to Def.'s 56.1.) Mr. Musto did not indicate, however, that Mr. Pappas himself faced potentially high liability exposure if a judgment were secured against him, nor did he advise Mr. Pappas to consider retaining independent counsel. (Pl.'s 56.1 ¶ 24.)

## C. Restoration's Request for Reimbursement and Representation

After First Speciality acceded to Restoration's request to retain Johnson & Bell, Restoration and its agents requested reimbursement for the approximately $145,000 in legal fees and costs incurred in the immediate aftermath of the accident. (Pl.'s 56.1 ¶ 18.) First Specialty disputed that some of the requested fees and expenses were necessary or applicable to the Underlying Lawsuits, or reimbursable under the terms of Restoration's policy. (Def.'s 56.1 ¶ 13.) So began a letter-writing campaign between Attorney Burgess and the attorney and assistant claims managers for First Specialty.

Ms. Burgess first requested reimbursement during a telephone conversation with Ronald Musto on July 17, 2003. (Pl.'s 56.1 ¶ 18; Burgess Aff. ¶ 6; Letter from R. Musto to L. Burgess of 7/17/03, Ex. D to Pl.'s 56.1.) The same day, Mr. Musto sent Ms. Burgess a letter requesting that Restoration submit documentation of its fees and costs for evaluation, and identifying Reed McGregor of Ward North America as the third-party administrator handling the day-to-day aspects of Restoration's claim on behalf of First Specialty. The letter also clarified that First Specialty had

not retained Johnson & Bell pursuant to *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187, 355 N.E.2d 24 (1976), which requires independent counsel where a conflict exists between the insureds.[6] (Letter from R. Musto to L. Burgess of 7/17/03, Ex. D to Pl.'s 56.1, at 1-2.) Shortly thereafter, during the week of July 27, 2003, Ms. Burgess had a telephone conversation with Mr. McGregor. (Burgess Aff. ¶ 11; Letter from R. Musto to L. Burgess of 7/15/03, Ex. 2(b) to Def.'s 56.1.) During that conversation, and in a confirmation letter dated August 5, 2003, Ms. Burgess asked First Specialty to assign separate *Peppers* defense counsel to Restoration's property manager, Jack Emery. (Pl.'s 56.1 ¶ 31.) Mr. Emery was being sued both as an alleged employee/manager of Restoration, and as a private individual, and Ms. Burgess expressed concern that his interests "could conflict with those of Mr. Pappas." (*Id.*; Letter from L. Burgess to R. McGregor of 8/5/03, Ex. G to Pl.'s 56.1.)

On September 5, 2003, Ms. Burgess again wrote to Reed McGregor requesting that First Specialty appoint independent counsel for Jack Emery, and also seeking representation for George Koutroumbis. Ms. Burgess noted that the Underlying Lawsuits alleged that Mr. Koutroumbis installed the porch as an "agent" of L.G. Properties, and explained that in the event Mr. Koutroumbis is not found to be such an agent, "Koutroumbis' interests are likely to be squarely adverse to those of Mr. Pappas and his corporate interests." (Pl.'s 56.1 ¶ 32; Letter from L. Burgess to R. McGregor of 9/5/03, Ex. I to Pl.'s 56.1.) Ms. Burgess further advised that counsel for the plaintiffs in the Underlying Lawsuits "has been aggressively pursuing relief from the Court to immediately depose Koutrumbis [sic], due to his alleged ill health."[7] (*Id.* ¶ 38; Letter from L.

---

[6]    The record does not reflect the basis for Mr. Musto's clarification. Presumably, he and Ms. Burgess discussed the matter during their telephone conversation.

[7]    On July 14, 2003, David Dermejian, one of the plaintiffs in the Underlying Lawsuits, filed an emergency motion to depose George Koutroumbis based on information and belief that Koutroumbis' ill health would render him unavailable for deposition in the future. (Pl.'s 56.1 ¶ 22; Ex. G to Complaint.) At a hearing before the Circuit Court on July 21, 2003, the motion was entered and continued to July 28, 2003. (Def. 56.1 ¶ 12; Order, *Dermejian v. LG Properties, et al.*,

Burgess to R. McGregor of 9/5/03, Ex. I to Pl.'s 56.1.) Soon thereafter, First Specialty agreed to provide Mr. Emery with a defense, but did not yet comment on Mr. Koutroumbis' representation. (Id. ¶ 33.) In the meantime, on September 17, 2003, Ms. Burgess submitted the requested bill documentation to First Specialty for review.[8] (Id. ¶ 18; Burgess Aff. ¶ 5.)

Several months later on January 21, 2004, Mr. Musto sent Ms. Burgess a letter denying coverage for claims against Mr. Koutroumbis.[9] (Letter from R. Musto to L. Burgess of 1/21/04, Ex. F to Pl.'s 56.1.) Mr. Musto explained as follows:

> As with any coverage analysis, we start out with the allegations in the many Complaints that have been filed; some of those refer to Mr. Koutroumbis as an 'agent' of the insureds, and others, we understand, claim or suggest that he was an 'employee' of one or more of the insureds. While the style of pleading has some impact upon an insurer's duty to defend, the true, underlying facts also are of utmost importance. In this case we have never been presented with the factual claim, either by your clients or by Mr. Koutroumbis, that he was in fact an employee of any of your clients or of our insureds.

(Id. at 2 (emphasis in original).) According to Mr. Musto, Restoration's policy covered only "employees" and not "agents" of the insured, and "there [wa]s no indication that Koutroumbis was ever an 'employee,' leased worker or real estate manager of or for any insured." (Id. at 3.) Mr. Musto invited Ms. Burgess to contact him if Restoration or its agents "want to take exception to this position, or would like to pass along further information." (Id.) He also indicated that "[w]hile no final decision has been made regarding our decision to tender the full amounts of our limits of

---

No. 03 L 8085 D, Ex. 6 to Def.'s 56.1.) The parties do not indicate what, if anything, occurred at the July 28 hearing.

[8]    It is not clear whether the documentation included fees and costs associated with Mr. Koutroumbis' defense.

[9]    The letter indicates that First Specialty "initially denied any tender of defense by or on behalf of Mr. Koutroumbis" by letter dated August 4, 2003, but that "recent discussions warrant a restatement of our position in this regard." (Letter from R. Musto to L. Burgess of 1/21/04, at 2.) Neither party has provided the court with a copy of the August 4 letter. Nor have they explained when the referenced discussions occurred, or who participated in them. Mr. Musto states only that he discussed Mr. Koutroumbis with Ms. Burgess "on several occasions . . . in the weeks after the June 29, 2003 accident." (Musto Aff. ¶ 8.)

liability of $1,000,000, it is my understanding that this decision is likely to be made in the reasonably near future." (*Id.* at 1-2.)

By April 2004, First Specialty had still declined to reimburse certain expenses and costs incurred by Restoration in the first weeks following the porch collapse. On April 14, 2004, Ms. Burgess wrote a letter to Dan Vance, an Assistant Claims Manager with First Specialty, forwarding at his request another copy of Restoration's accumulated bills and expenses. (Letter from L. Burgess to D. Vance of 4/14/04, Ex. L to Pl.'s 56.1.)

**D.    Restoration's Lawsuit**

The next day, on April 15, 2004, Restoration filed suit in the Circuit Court of Cook County seeking a declaratory judgment requiring First Specialty to reimburse Restoration for reasonable and necessary costs of defending the Underlying Lawsuits (Count I) and to defend Mr. Koutroumbis in those actions (Count II). First Specialty removed the case to federal court on May 25, 2004 based on diversity jurisdiction, 28 U.S.C. § 1332. On June 1, 2004, First Specialty moved to dismiss Count II of the Complaint, arguing that there is no case or controversy involving Mr. Koutroumbis because he is not a named party in the litigation. This court denied the motion on June 10, 2004, noting that the Underlying Lawsuits identify Mr. Koutroumbis as Restoration's employee or agent.[10]  The court explained that "[i]f he is not in fact an employee, defendant is nevertheless required to provide a defense under a reservation of rights and may, if appropriate, move to dismiss claims against him." (Order of 6/10/04, Doc. No. 9.)

**E.    First Specialty's Oversight of the Underlying Lawsuits**

Sometime during the weekend of August 20, 2004, Mr. Koutroumbis died. For reasons not explained in the record, Mr. Koutroumbis was never deposed before his death, and in answering

---

[10]    More accurately, the Underlying Lawsuits allege that Mr. Koutroumbis was an employee or agent of L.G. Properties.

the complaints against him, he asserted his Fifth Amendment right against self-incrimination. (Pl. 56.1 ¶¶ 45, 48.) Notwithstanding this court's ruling on June 10, 2004 that First Specialty had a duty to defend Mr. Koutroumbis pending a final determination as to his employment status, First Specialty waited until October 11, 2004 to advise Johnson & Bell that the law firm would provide a defense for Mr. Koutroumbis. (Id. ¶ 46.) Restoration claims that Johnson & Bell never heard thereafter from any insurance defense counsel regarding Mr. Koutroumbis' defense. (Id. ¶ 47.) First Specialty maintains that it retained Tony Tunney of Price, Tunney & Reiter to provide a defense to Mr. Koutroumbis and/or his Estate. (Vance Aff. ¶ 2.) First Specialty has not identified the date on which it retained Mr. Tunney, however, nor is there any documentation confirming his retention to represent Mr. Koutroumbis. (See Pawlicki Aff., Ex. B to Pl.'s S.J. Reply, ¶ 3; ¶ 7 (also questioning whether Mr. Tunney is truly "independent" in this matter).)

Restoration claims that after First Specialty agreed to retain Johnson & Bell to defend the Underlying Lawsuits, First Specialty refused to pay for more than one attorney to attend depositions or read a deposition transcript or abstract, or for more than two attorneys to attend strategy meetings in order to synchronize case management. (Pl.'s 56.1 ¶¶ 49, 50; Burgess Aff. ¶ 16; Nowicki Aff. ¶ 1.) Attorney Frank Nowicki of Johnson & Bell asserts that he has been "required to provide Dana Shay of First Specialty with reports and assessments of the underlying litigation and of our defense strategy, and ha[s] been required to justify the need to conduct research or engage in other defense-related activities." (Nowicki Aff., Ex. C to Pl.'s Reply, ¶ 1.)[11]

Restoration has submitted a series of email exchanges between Mr. Nowicki and Ms. Shay, who is employed by Ward North America as a Litigation Specialist, relating to Ms. Shay's objections to various invoices. (Group Ex. 1 to Nowicki Aff.; Shay Aff., Ex. 8 to Def.'s 56.1, ¶ 1.) For example, on June 21, 2004, Mr. Nowicki emailed Ms. Shay to explain, among other things, that "it didn't

---

[11]     Plaintiff's Reply Brief in Support of Summary Judgment on Estoppel is cited as "Pl.'s Reply, at ___."

seem unreasonable for us to have two attorneys present" at an inspection that was attended by "many plaintiffs attorneys and experts." (*Id.*) In the same email message, Mr. Nowicki addressed Ms. Shay's specific objections to a recent invoice, justifying time spent preparing a memo setting forth the factual basis for a press release; time spent determining what wrongful death cases had been filed; the decision to retain an expert on porch construction; time spent reviewing deposition testimony; time spent reviewing photos of the porch; and time spent advising lead counsel William Johnson as to what occurred at depositions. (*Id.*) The next day, Ms. Shay emailed Mr. Nowicki to remind him that "[a]s we've discussed many times, if you're going to have more than one atty do something, you need prior approval." (*Id.*) In September 2004 and January 2005, Mr. Nowicki sought Ms. Shay's authorization to staff certain confidential aspects of the investigation. Finally, on January 24, 2005, Mr. Nowicki emailed Ms. Shay to obtain her approval to file third-party complaints and counterclaims against the tenants of the Property. (*Id.*)

First Specialty denies that it limited attorney attendance at depositions and meetings, but the record demonstrates that Mr. Nowicki was required repeatedly to seek Ms. Shay's approval for such activities. Ms. Shay's affidavit, cited by First Specialty on this issue, merely indicates that she (1) "ha[s] never been involved with or consulted about the day to day strategic defense decisions made by Restoration Specialists, L.G. Properties, Mr. Pappas and/or Johnson & Bell"; and (2) "realized that the Underlying Lawsuits were complex matters and agreed that the defense of these matters would necessitate that Johnson & Bell employ different and more extensive defense activities that would be necessary in a single claim." (Def.'s 56.1 Resp. ¶¶ 49, 50; Shay Aff. ¶¶ 3, 5.) Ms. Shay insists that she "never refused to pay for any research," but admits that she "asked Johnson & Bell to advise me in advance of research to be conducted." (Shay Aff. ¶ 4; Pl.'s 56.1 ¶ 53.)

10

## F. The Continuing Dispute Over Payments

On October 6, 2004, attorney Douglas J. Morrissey of Bollinger, Ruberry & Garvey sent a letter to Ms. Burgess on behalf of First Specialty enclosing partial payment of some of Restoration's bills for fees and expenses incurred in the first weeks following the porch collapse. (Def.'s 56.1 ¶ 15; Pl.'s 56.1 Resp. ¶ 15.)[12] Specifically, First Specialty issued (1) a check payable to Restoration in the amount of $1,968.84 to reimburse payments made for services in securing the accident site; (2) a check payable to the law firm of Ungaretti & Harris[13] in the amount of $67,585.64 for legal services rendered; and (3) a check payable to the law firm of Katz, Friedman, Eagle, Eisenstein & Johnson in the amount of $863 for services relating to the coordination of Restoration's defense. First Specialty declined to pay Ungaretti & Harris for attorney time spent discussing insurance coverage and attending to a pending criminal investigation, and made deductions from its payment to Katz, Friedman, Eagle, Eisenstein & Johnson for attorney time relating to insurance coverage issues. (Letter from D. Morrissey to L. Burgess of 10/6/04, Ex. 10 to Def.'s 56.1.) First Specialty also requested further documentation in support of Restoration's request for payments relating to legal services provided by the law firms of Fasano & Farina; Murray, Jensen & Wilson; and the Kleinfeld Law Firm of Miami, Florida; and for public relations services provided by Weber Shandwick.[14] (*Id.* at 2.)

On October 12, 2004, Ms. Burgess responded to Mr. Morrissey's letter, offering further explanations for the requested fees and costs, and again demanding full payment of those expenses plus interest. (Letter from L. Burgess to D. Morrissey of 10/12/04, Ex. L to Pl.'s 56.1.) Approximately one month later on November 16, 2004, Ms. Burgess wrote another letter to Mr.

---

[12]   Plaintiff's Local Rule 56.1 Reply to Defendant's Statement of Additional Facts is cited as "Pl.'s 56.1 Resp. ¶ __."

[13]   The court is uncertain of what services were provided by Ungaretti & Harris.

[14]   Again, the court has no information concerning the services provided by these firms.

Morrissey, complaining that "due to [First Specialty's] eagle-eye on cost savings, your client and its third-party administrator [Ward North America] have been making it very difficult for the defense team to do its job." (Pl.'s 56.1 ¶ 55; Letter from L. Burgess to D. Morrissey of 11/16/04, Ex. J to Pl.'s 56.1.) Ms. Burgess objected to First Specialty's "unreasonable 'accounting' demands on the defense team and other critical third-party service providers by e.g., requiring detailed justification of expenses, personnel, and time spent on matters both prior to permitting services to be rendered and after services have already been rendered." (Letter from L. Burgess to D. Morrissey of 11/16/04, at 1.) Ms. Burgess described the process as "denigrating to the service provider" and cautioned that it was "placing my client's interests in jeopardy." By way of example, Ms. Burgess informed Mr. Morrissey that Restoration's primary investigator, Tom Reynolds, no longer wished to handle the porch collapse matter due to the "cumbersome and untenable" accounting demands placed upon him. (Id.)

Ms. Burgess wrote to Mr. Morrissey again on December 3, 2004, reiterating Restoration's demand for prompt payment of all outstanding bills. (Letter from L. Burgess to D. Morrissey of 12/3/04, Ex. L to Pl.'s 56.1.) Three days later on December 6, 2004, Mr. Morrissey responded to Ms. Burgess' letter, assuring her that "those payments are pending." Mr. Morrissey also expressed First Specialty's willingness to meet and discuss a possible resolution of the matter. (Def.'s 56.1 ¶ 16; Letter from D. Morrissey to L. Burgess of 12/6/04, Ex. 11 to Def.'s 56.1.) On December 13, 2004, Ms. Burgess wrote a letter confirming a December 10, 2004 conversation with Mr. Morrissey. The parties apparently agreed in that conversation that First Specialty would make full payment for all "costs, expenses and attorneys' fees and costs (accumulated in the underlying litigation) for which [Restoration] previously sought payment in writing," including fees and costs incurred by Ms. Burgess. (Letter from L. Burgess to D. Morrissey of 12/13/04, Ex. K to Pl.'s 56.1.) Shortly thereafter on December 23, 2004, First Specialty tendered payment of outstanding bills to Ungaretti & Harris, Fasano & Farina, and L.G. Properties. (Def.'s 56.1 ¶ 17; Group Ex. 12 to Def.'s 56.1.)

## G.  The Pending Motions

On February 24, 2005, Restoration filed a motion for summary judgment arguing that First Specialty should be estopped from asserting any policy defenses to its initial refusal to provide coverage in defense of the Underlying Lawsuits.  Restoration also seeks sanctions against First Specialty pursuant to 215 ILCS 5/155 for its "vexatious conduct in handling the underlying litigation."  (Plaintiff's Motion for § 155 Sanctions ¶ 2.)  First Specialty opposes the motions and seeks a stay of these proceedings pending resolution of the Underlying Lawsuits.

## DISCUSSION

### I.  Motion for a Stay

First Specialty has moved for a stay of this case pending resolution of the Underlying Lawsuits.  First Specialty argues that it needs to conduct discovery to determine whether the Underlying Lawsuits are being adequately defended and whether Mr. Koutroumbis was truly an "employee" of Restoration and/or L.G. Properties when he constructed the porch.  (Motion for Stay, at 6-7.)  First Specialty also claims that adjudicating its duty to defend will prejudice Restoration in the Underlying Lawsuits.  (Stay Reply, at 2-4.)  The court does not find any of these arguments persuasive.

Based on representations from First Specialty regarding its discovery needs, the court entered an order on July 15, 2004 setting a discovery completion date of October 29, 2004.  That date passed without First Specialty conducting any oral or written discovery in the case.  Following several months of negotiation efforts, Restoration filed its motion for summary judgment on February 24, 2005.  More than one month later on April 5, 2005, First Specialty moved to stay these proceedings.  The court agrees with Restoration that First Specialty's claimed need for discovery at this time is "a day late and a dollar short."  (Pl.'s Response to Stay, at 2.)

More significantly, Restoration's current motion for summary judgment does not in fact require resolution of the sensitive factual issues identified by First Specialty. Restoration seeks summary judgment based on an estoppel theory: Restoration contends that the Underlying Lawsuits triggered a duty to defend, and that First Specialty should be estopped from asserting any defenses to coverage because of its refusal to provide a timely defense. (Pl.'s Response to Stay, at 6.) Contrary to First Specialty's suggestion, a finding of estoppel under such circumstances does not equate with a finding that First Specialty has an absolute duty under its policy terms to defend Restoration and/or Mr. Koutroumbis in all lawsuits arising from the June 2003 porch collapse. Mr. Koutroumbis's actual employment status, and the adequacy of the defense provided to date, are irrelevant to whether First Specialty has forfeited its right to refuse coverage for the Underlying Lawsuits – even if Mr. Koutroumbis is ultimately determined not to be an employee – by failing to provide a timely defense. *See, e.g., Fremont Compensation Ins. Co. v. Ace-Chicago Great Dane Corp.*, 304 Ill. App. 3d 734, 743, 710 N.E.2d 132, 139 (1st Dist. 1999) (though *Peppers* and its progeny prohibit resolution in a declaratory judgment proceeding of any ultimate fact upon which recovery in the underlying lawsuit is predicated, they "present no impediment to a court's determination of factual issues relevant to an insurer's duty to defend its insured in a pending and unresolved suit when those factual determinations do not impact upon the underlying plaintiff's ability to pursue a theory of liability or resolve any issue critical to the insured's liability in the underlying litigation.")

The court recognizes that at the time of Restoration's initial complaint, there were only 31, as opposed to 39, pending lawsuits related to the porch collapse. The lawsuits all relate to the same incident, however, and involve the same or similar factual issues. In addition, First Specialty's alleged failure to provide prompt coverage for the early lawsuits could have some effect on the handling and resolution of subsequent lawsuits – for example, Mr. Koutroumbis has now died without any deposition testimony. Thus, it is appropriate to address the estoppel issue even

14

though plaintiffs may continue filing new lawsuits that may or may not name Mr. Koutroumbis as a defendant. First Specialty's motion for a stay is denied.

## II.    Motion for Summary Judgment

Restoration seeks summary judgment on the theory that First Specialty is estopped from asserting any defenses to coverage. Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Restoration argues that First Specialty had a duty to defend Mr. Koutroumbis in the Underlying Lawsuits, and that its failure to do so for a period of some 16 months constitutes bad faith warranting a full estoppel.

### A.    The Duty to Defend Mr. Koutroumbis

It is well-established under Illinois law that where an underlying lawsuit "alleges facts within the coverage of the policy or potentially within the coverage of the policy, the duty to defend has been established." *Peppers*, 64 Ill. 2d at 193, 355 N.E.2d at 28. This is true even where the underlying allegations are "groundless, false, or fraudulent." *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 153, 708 N.E.2d 1122, 1136 (1999) (quoting *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 73, 578 N.E.2d 926, 930 (1991)). If an insurer has doubts as to whether a claim fairly triggers its defense obligations, it must either (1) defend the suit under a reservation of rights, or (2) seek a declaratory judgment that there is no coverage. *Id.* at 150, 708 N.E.2d at 1135. Failure to take one of these actions results in an estoppel barring the insurer from raising policy defenses to coverage, "even those defenses that

15

may have been successful had the insurer not breached its duty to defend." *Id.* at 152, 153, 708 N.E.2d at 1135, 1136. *See also Willis Corroon Corp. v. Home Ins. Co.*, 203 F.3d 449, 452 (7th Cir. 2000).

The Underlying Lawsuits variously allege that Restoration and L.G. Properties "hired" Mr. Koutroumbis to construct the porch and/or that Mr. Koutroumbis was an "agent" of L.G. Properties. (Ex. B1-31 to Complaint.) In denying coverage for Mr. Koutroumbis, First Specialty acknowledged that some of the lawsuits "refer to Mr. Koutroumbis as an 'agent' of the insureds, and others, we understand, claim or suggest that he was an 'employee' of one or more of the insureds." (Letter from R. Musto to L. Burgess of 1/21/04, Ex. F to Pl.'s 56.1.) First Specialty nevertheless declined coverage on the basis that it "ha[s] never been presented with the factual claim, either by your clients or by Mr. Koutroumbis, that he was in fact an employee of any of your clients or of our insureds." (*Id.* at 2 (emphasis in original).) As the case law makes clear, this argument misconstrues the insurer's obligation. Once the Underlying Lawsuits alleged Mr. Koutroumbis's status as an employee, First Specialty had a duty to defend him. *Employers Ins. of Wausau*, 186 Ill. 2d at 153, 708 N.E.2d at 1136 (quoting *Wilkin Insulation Co.*, 144 Ill. 2d at 73, 578 N.E.2d at 930) ("The insurer may not refuse to defend 'unless it is *clear* from the face of the underlying complaint[] that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage.'") (emphasis in original); *Howalt v. Ohio Cas. Ins. Co.*, 142 Ill. App. 3d 435, 439, 491 N.E.2d 1207, 1210 (1st Dist. 1986) ("In Illinois, where a person is alleged to have performed work and labor for another, it is *prima facie* evidence of employment and creates a presumption that such person is the servant and employee of the other.") To the extent First Specialty suspected the allegation to be false, its options were to either defend the lawsuits under a reservation of rights, or to seek a declaratory judgment that there was no coverage. *Id.* First Specialty pursued neither of these options, raising the question whether it should now be estopped from asserting any defenses to coverage as a result.

16

## B. Estoppel

Restoration argues that estoppel is appropriate here because First Specialty acted in bad faith in declining to defend Mr. Koutroumbis for more than a year and in failing to provide Restoration with an adequate defense. First Specialty claims that estoppel does not apply where, as here, the insurer appoints independent counsel to represent the insured. First Specialty also maintains its position that it had no duty to defend Mr. Koutroumbis.

### 1. Independent Counsel

First Specialty insists that the estoppel doctrine is inapplicable because the company provided Restoration with independent defense counsel on June 30, 2003, the day after the accident. (Def.'s Resp. to S.J., at 4.)[15] Restoration denies that First Specialty hired defense counsel on June 30, noting that the insurer first approved Restoration's request to retain William Johnson of Johnson & Bell on July 15, 2003. In any event, the more significant dispute is whether Mr. Johnson was retained as "independent" counsel pursuant to *Peppers*.

The general rule under Illinois law is that an insurer controls the defense of its insured. *Nandorf, Inc. v. CNA Ins. Cos.*, 134 Ill. App. 3d 134, 137, 479 N.E.2d 988, 991 (1st Dist. 1985). Where the parties' interests conflict, however, an insured may appoint independent counsel, known as *Peppers* counsel, to control litigation. *Id.* See also *Peppers*, 64 Ill. 2d at 198-99, 355 N.E.2d at 31 (where insurance policy covered only the negligent actions of the insured, and the insured was charged in a lawsuit with both negligent and willful conduct, the insured "ha[d] the right to be defended in the personal injury case by an attorney of his own choice who shall have the right to control the conduct of the case.") "In determining whether a conflict of interest exists, Illinois courts have considered whether, in comparing the allegations of the complaint to the policy terms, the

---

[15]    Defendant's Response to Plaintiff's Motion for Summary Judgment is cited as "Def.'s Resp. to S.J., at ___."

interest of the insurer would be furthered by providing a less than vigorous defense to those allegations." *Id.* at 137, 479 N.E.2d at 992. Courts have found such a conflict of interest where "the underlying action asserts claims that are covered by the insurance policy and other causes which the insurer is required to defend but asserts are not covered by the policy." *Id.* at 138, 479 N.E.2d at 992 (citing *Thornton v. Paul,* 74 Ill. 2d 132, 384 N.E.3d 335 (1978)). A conflict also exists where "an insurer is obligated to provide defenses for two or more insureds who have adverse interests." *Allied American Ins. Co. v. Ayala,* 247 Ill. App. 3d 538, 546, 616 N.E.2d 1349, 1357 (2d Dist. 1993).

In this case, First Specialty agreed to appoint Restoration's chosen counsel, Johnson & Bell, but specifically denied the existence of a conflict of interest or any obligations under *Peppers:*

> To clarify our consent to the use of Johnson & Bell as defense counsel for the insureds, please note that we do not agree that the doctrines expressed in the *Peppers* case apply to this claim at this time . . . . Rather we agreed to waive our contractual right to assign defense counsel in order to avoid an unnecessary dispute with you and your clients over this issue. This waiver is without waiver of any other term, condition or limitation contained within the subject policy.

(Letter from R. Musto to L. Burgess of 7/17/03, Ex. D to Pl.'s 56.1, at 1.) The conflict in this case, however, is unmistakable. As Restoration explained in a letter to First Specialty dated July 9, 2003:

> We believe that controlling Illinois law will support my clients' right to select their own defense counsel at this time . . . . Indeed, due to First Specialty's low indemnification policy limits and the large number of significant claims that are likely to be filed, my clients and their umbrella carrier face enormous financial exposure in this matter.

(Letter from L. Burgess to L. Wright of 7/9/03, Ex. H to Pl.'s 56.1, at 2.)[16]

Based on the allegations in the Underlying Lawsuits, moreover, First Specialty at all times had a duty to defend Mr. Koutroumbis. The record reflects that Restoration first requested representation for Mr. Koutroumbis on September 5, 2003; at that point, First Specialty was on

---

[16] There is no other reference in the record to Restoration's umbrella carrier or the role, if any, it plays in this dispute.

notice of its duty to defend and of the potential conflict of interest between Mr. Koutroumbis and Restoration. Specifically, Restoration reported that the Underlying Lawsuits alleged that Mr. Koutroumbis installed the porch as an "agent" of L.G. Properties, and observed that if Mr. Koutroumbis is not found to be such an agent, "Koutroumbis' interests are likely to be squarely adverse to those of Mr. Pappas and his corporate interests."[17] (Letter from L. Burgess to R. McGregor of 9/5/03, Ex. I to Pl.'s 56.1.) See Allied American Ins. Co., 247 Ill. App. 3d at 546, 616 N.E.2d at 1357 (a conflict of interest exists where "an insurer is obligated to provide defenses for two or more insureds who have adverse interests.") Thus, First Specialty was required to appoint counsel for Restoration and for Mr. Koutroumbis.

First Specialty waited more than a year, until October 2004, to appoint any counsel for Mr. Koutroumbis, but insists that it appointed independent counsel for Restoration by agreeing to retain Johnson & Bell. In a July 17, 2003 letter, First Specialty did acknowledge that "the sole attorney/client relationship(s) is between [Johnson & Bell] and the insureds under our policy. We are entitled to reports and other information within our Guidelines from Johnson & Bell, but we do not presume to overcome or violate the attorney/client relationship between that firm and the insureds." (Letter from R. Musto to L. Burgess of 7/17/03, Ex. D to Pl.'s 56.1, at 1.) First Specialty also submits an affidavit from Ward North America's Litigation Specialist, Dana Shay, stating that she has "never asked Johnson & Bell to consult with me about or seek approval from me for defense related activities," and that she "ha[s] never been involved with or consulted about the day to day strategic defense decisions made by Restoration Specialists, L.G. Properties, Mr. Pappas and/or Johnson & Bell." (Def.'s 56.1 Resp. ¶ 49; Shay Aff., Ex. 8 to Def.'s 56.1, ¶¶ 3, 4.)

---

[17]     Neither party explains the exact nature of the conflict between Restoration and Mr. Koutroumbis. In the court's view, if Mr. Koutroumbis is found not to be an agent of Restoration, there will be some incentive for his defense to argue that Restoration is solely responsible for any problems with the porch. That said, Mr. Koutroumbis and Restoration may well have a shared interest in establishing that the work Mr. Koutroumbis did on the porch met the standard of care.

Restoration maintains that First Specialty has in fact monitored Johnson & Bell's defense strategy at every turn, citing attorney Frank Nowicki's affidavit that "[s]ince my firm was retained to represent Plaintiff in the underlying suits, I have been required to provide Dana Shay of First Specialty with reports and assessments of the underlying litigation and of our defense strategy, and have been required to justify the need to conduct research or engage in other defense-related activities . . . *prior to* engaging in those defense-related activities." (Nowicki Aff., Ex. C to Pl.'s Reply, ¶ 1 (emphasis in original).) In support of this position, Restoration has submitted a series of email exchanges between Mr. Nowicki and Ms. Shay relating to Ms. Shay's objections to various invoices. (Group Ex. 1 to Nowicki Aff.; Shay Aff., Ex. 8 to Def.'s 56.1, ¶ 1.) For example, on June 21, 2004, Mr. Nowicki emailed Ms. Shay to justify time spent preparing a memo setting forth the factual basis for a press release; time spent determining what wrongful death cases had been filed; the decision to retain an expert on porch construction; time spent reviewing deposition testimony; time spent reviewing photos of the porch; and time spent advising lead counsel William Johnson as to what occurred at depositions. (*Id.*) Mr. Nowicki also emailed Ms. Shay to request permission to have more than one attorney meet with an expert witness, likely in response to a June 22, 2004 email from Ms. Shay admonishing that "[a]s we've discussed many times, if you're going to have more than one atty do something, you need prior approval." (*Id.*) As noted earlier, Ms. Shay insists that she "never refused to pay for any research," but admits that she "asked Johnson & Bell to advise me in advance of research to be conducted." (Shay Aff. ¶ 4; Pl.'s 56.1 ¶ 53.)

To satisfy the obligation to appoint "independent counsel," an insurer "must decline to participate in the defense" of the insured. *Country Mut. Ins. Co. v. Livorsi Marine, Inc.*, 358 Ill. App. 3d 880, 883, 833 N.E.2d 871, 873 (1st Dist. 2004). At the same time, the insurer must "reimburs[e] the insured for the costs of the defense." *Employers Ins. of Wausau*, 186 Ill. 2d at 156, 708 N.E.2d at 1137. *See also Peppers*, 64 Ill. 2d at 199, 355 N.E.2d at 31 (insurer must furnish the insured "a defense [and] it must reimburse him for the reasonable cost of defending the action.") It appears

20

that First Specialty required Johnson & Bell to justify its expenditures in defending the Underlying Lawsuits, but it is not clear from the record whether First Specialty was involved in strategy decisions, or whether it ultimately failed to grant prior approval, or pay, for any requested expenses.[18] First Specialty has thus raised a question of fact as to whether it appointed "independent" counsel for Restoration.

## 2. Adequacy of Defense

Even assuming Johnson & Bell qualifies as "independent" counsel for Restoration, estoppel may still arise from First Specialty's (1) refusal to provide a defense for Mr. Koutroumbis for more than a year after Restoration notified the insurer of its duty to defend, and (2) failure to provide timely reimbursement for Restoration's legal expenses. On the first point, First Specialty states only that it had no duty to defend Mr. Koutroumbis because he was not an "employee" of Restoration or L.G. Properties and, thus, not an "insured" under Restoration's policy. As explained earlier, this argument is a non-starter.

Based on the allegations in the Underlying Lawsuits, First Specialty had a duty to defend Mr. Koutroumbis but refused to do so until October 11, 2004. Where an insurer has a duty to defend an individual and not only fails to seek a declaratory judgment regarding coverage but also waits more than a year before agreeing to defend the suit under a reservation of rights, the insurer is estopped from raising policy defenses to coverage. In *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, for example, the insured lumber company, Ehlco Liquidating Trust, asked its insurance company to defend it against a federal investigation and proceeding relating to environmental contamination at its Mena, Arkansas wood-treatment facility. 186 Ill. 2d at 132, 708 N.E.2d at 1126. The insurer refused Ehlco's request in 1982, but waited until 1993 to seek a

---

[18]     As noted earlier, Philip Pappas and various service providers incurred approximately $145,000 in expenses in the immediate aftermath of the accident, before First Specialty agreed to retain Johnson & Bell on July 15, 2003. After a lengthy delay, First Specialty ultimately reimbursed those expenses in full as of December 23, 2004. (Pl.'s 56.1 ¶ 16; Def.'s 56.1 ¶ 17.)

declaratory judgment that it owed no duty to defend. At that time, the insurer sought a declaration that it owed no duty to defend Ehlco against a separate action involving a different wood-treatment facility in Albany County, Wyoming. *Id.* at 133, 134, 708 N.E.2d at 1127. Ehlco counterclaimed seeking indemnification for the environmental damage at the Mena site, at which time the insurer sought a declaration that it had no duty to defend that action. *Id.* at 135, 708 N.E.2d at 1127.

The circuit court held that the insurer was estopped from asserting any defenses to coverage for the Mena site incident because it failed to defend Ehlco or to file a timely declaratory judgment action. *Id.*, 708 N.E.2d at 1128. The Illinois Appellate Court affirmed, noting that Ehlco's purported failure to provide timely notice of the claim provided no defense: "If an insurer believes that it received notice too late to trigger its obligations, it should defend its insured under a reservation of rights or litigate the matter in a declaratory judgment action." *Id.* at 154, 708 N.E.2d at 1136. *See also Insurance Co. of State of Pa. v. Protective Ins. Co.*, 227 Ill. App. 3d 360, 368, 592 N.E.2d 117, 122 (1st Dist. 1992) ("When the duty to defend is clear, an insurer cannot avoid its obligation and then insulate itself from the imposition of an estoppel by an eleventh hour filing of a declaratory judgment action.") Based on this authority, the court agrees with Restoration that First Specialty is estopped from asserting any policy defenses to coverage for Mr. Koutroumbis.

Restoration argues that it is also entitled to sanctions under 215 ILCS 5/5155 based on First Specialty's "vexatious conduct in handling the underlying litigation."[19] (Pl.'s Motion for § 155 Sanctions ¶ 2.) Restoration asserts that First Specialty had a clear duty to defend Mr. Koutroumbis

---

[19]    Section 155 provides:

In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees [and] other costs, plus [certain penalties] . . . .

215 ILCS 5/155.

but failed to do so for reasons that are "squarely contrary to well-settled law in Illinois." (Pl.'s Reply in Support of § 155 Sanctions, at 7-8.) The court agrees that First Specialty's refusal to defend Mr. Koutroumbis in any respect for more than a year after receiving notice of its duty to defend constitutes "vexatious and unreasonable" behavior sufficient to invoke sanctions under § 155. In *Korte Constr. Co. v. American States Ins.*, 322 Ill. App. 3d 451, 750 N.E.2d 764 (5th Dist. 2001), for example, American States Insurance refused to defend Korte Construction Company in a wrongful death action involving one of its employees. Korte sought and obtained a declaratory judgment that American was required to indemnify it in the lawsuit, and was also awarded sanctions under § 155. *Id.* at 453, 456, 750 N.E.2d at 766, 768. In affirming the sanctions award, the Illinois Appellate Court found that American's conduct was vexatious and unreasonable because the insurer "refused Korte's repeated requests for a defense, failed to file a declaratory judgment action to adjudicate its rights and obligations under the policy, and instead abandoned its insured, thereby forcing the insured to file this declaratory judgment action." *Id.* at 460, 750 N.E.2d at 772. Restoration is entitled to attorneys' fees incurred in bringing this declaratory action seeking coverage for Mr. Koutroumbis, as well as appropriate penalties under § 155.

First Specialty cannot avoid this result by arguing that it honored its duty to defend at least some of its insureds. In *Insurance Co. of State of Pa. v. Protective Ins. Co.*, 227 Ill. App. 3d 360, 592 N.E.2d 117 (1st Dist. 1992), John and Sandra Reid, doing business as R&D Trucking, owned a tractor that was leased to Hamilton Trucking Company. While operating that tractor, John Reid was involved in a car accident. *Id.* at 362, 592 N.E.2d at 119. The driver of the car filed a negligence suit against John Reid, Hamilton, and R&D Trucking in the Circuit Court of Cook County in May 1986, and specifically alleged that Reid was the employee and agent of Hamilton at the time of the accident. *Id.* Protective Insurance Company, which insured the Reids and R&D Trucking, tendered the defense to Hamilton's insurer, Insurance Company of the State of Pennsylvania ("ICSP"), in May 1986. *Id.* at 362-63, 592 N.E.2d at 119. ICSP rejected the tender in October 1986

23

based on its belief that Reid was not in fact an insured "employee" under Hamilton's policy, and proceeded to defend Hamilton alone. Nearly two years later in September 1988, ICSP filed a declaratory judgment action seeking a declaration of its rights and obligations as to the Reids and R&D Trucking. *Id.* at 363, 592 N.E.2d at 119-20. In the meantime, Protective took over the defense of the Reids and R&D Trucking until the parties in the underlying negligence action settled the dispute in June 1989. *Id.*, 592 N.E.2d at 120.

In October 1989, Protective filed an action against ICSP seeking a declaration that the insurer was responsible for defending the Reids and R&D Trucking in the car accident. *Id.* at 363-64, 592 N.E.2d at 119-20. The circuit court granted summary judgment to Protective, finding that ICSP was estopped from asserting any defenses to coverage because it had failed to file a timely declaratory action or to defend the Reids and R&D Trucking under a reservation of rights. *Id.* at 364, 592 N.E.2d at 120. On appeal, ICSP conceded that it had a duty to defend the Reids and R&D Trucking but argued that estoppel was inappropriate because it had defended Hamilton and had in fact filed a declaratory judgment action before the underlying lawsuit was settled. *Id.* at 365, 592 N.E.2d at 121. The court disagreed, finding that ICSP's obligation "was not satisfied by its defense of Hamilton and the filing of a declaratory judgment action more than two years after refusing the tender of defense for Reid." *Id.* at 367-68, 592 N.E.2d at 122. The court also noted that ICSP could not "benefit from the fact that Reid's insurance company fortuitously took over Hamilton's obligation to defend." *Id.*

As in *Insurance Co. of State of Pa.*, the mere fact that First Specialty agreed to defend Restoration, L.G. Properties, Philip Pappas, and Jack Emery does not preclude estoppel for its refusal to defend Mr. Koutroumbis in a timely fashion. Nor can First Specialty avoid estoppel by arguing that the doctrine only applies where the insured establishes that it was prejudiced as a result of the failure to defend. (Def.'s S.J. Resp., at 2-3.) Prejudice constitutes an element of estoppel where an insurer assumes the defense of an insured without reserving its rights but later

24

seek a determination that there is no duty to defend or indemnify. *See Employers Ins. of Wausau*, 186 Ill. 2d at 158, 708 N.E.2d at 1138. Estoppel arising from a breach of a duty to defend, however, does not require a showing of prejudice. *Id.*

Restoration argues that the estoppel should apply to all potential policy defenses, including policy limits, because Mr. Koutroumbis was "the key actor that spurred *all* of the underlying tort litigation in this matter" and First Specialty acted in bad faith in refusing to defend him. (Pl.'s S.J. Motion, at 8, 10 (emphasis in original).) *See Conway v. Country Cas. Ins. Co.*, 92 Ill. 2d 388, 398, 442 N.E.2d 245, 249 (1982) ("an insurer is liable for the full amount of a judgment or settlement, even if it exceeds the policy limits, if the insurer acted in bad faith in refusing to defend its insured.") "What constitutes bad faith depends largely upon the particular circumstances of the case, particularly the insurer's conduct and its reasons for nonpayment." *Emerson v. American Bankers Ins. Co. of Florida*, 223 Ill. App. 3d 929, 936, 585 N.E.2d 1315, 1320 (5th Dist. 1992). Examples of conduct that supports a finding of bad faith include "failure to adequately investigate a claim or denial of the claim without adequate supporting evidence"; "failure to evaluate a claim objectively"; "interpreting policy provisions in an unreasonable manner"; and "abusive or coercive practices designed to compel compromise of a claim." *Id.*, 585 N.E.2d at 1320-21.

Restoration argues that First Specialty acted in bad faith by ignoring its obligation to promptly ask Mr. Koutroumbis if he wanted a defense. (Pl.'s S.J. Reply, at 10 (citing *Schal Bovis, Inc. v. Casualty Ins. Co.*, 315 Ill. App. 3d 353, 367, 732 N.E.2d 1179, 1189 (1st Dist. 2000) ("insurers have an affirmative duty to contact their insureds when they have knowledge that the insured may be covered by a policy issued by the insurer . . . .").) Restoration also notes that First Specialty failed to ensure that Mr. Koutroumbis gave a deposition despite knowing about his life-threatening illness. (Pl.'s S.J. Motion, at 3.) In addition, Restoration cites First Specialty's failure to reimburse Restoration's legal fees in a timely manner, delay in appointment of counsel, and excessive monitoring of expenses. (Pl.'s S.J. Reply, at 12.) *Employers Ins. of Wausau*, 186 Ill. 2d

at 156, 708 N.E.2d at 1137 (affirming estoppel against insurer that "failed to provide [the insured] a defense by reimbursing it for costs as they were incurred.")

First Specialty clearly acted in bad faith in refusing to defend Mr. Koutroumbis until October 2004. Whether that also constitutes "bad faith" in First Specialty's defense of Restoration is a question of fact best resolved by a jury. See, e.g., Ikari v. Mason Properties, 314 Ill. App. 3d 222, 227, 731 N.E.2d 975, 980 (2d Dist. 2000) ("The determination of bad faith is a question of fact to be resolved by the trier of fact.") The court notes that it is not at all clear that First Specialty's delay in representing Mr. Koutroumbis was the reason his deposition did not go forward. As for Restoration's financial objections, First Specialty did reimburse at least some of Restoration's legal expenses as they were incurred. There is evidence that First Specialty initially questioned certain expenses and requested additional documentation, but all of those expenses are now paid. Cf. Employers Ins. of Wausau, 186 Ill. 2d at 156, 708 N.E.2d at 1137 (insurer estopped from asserting policy limits where it "did nothing other than request information from [the insured]" and subsequently offer to pay 9% of a $1.3 million settlement offer.) The court finds a question of fact as to whether First Specialty acted in bad faith sufficient to estop it from asserting all policy defenses to coverage, including policy limits, as to Restoration.

For similar reasons, the court finds a question of fact as to whether First Specialty engaged in "vexatious and unreasonable" behavior sufficient to invoke sanctions under § 155 with respect to its defense of Restoration. Buckner v. Causey, 311 Ill. App. 3d 139, 150, 724 N.E.2d 95, 105 (1st Dist. 1999) ("The question of whether any given behavior is vexatious and unreasonable [for purposes of § 155] is a question of fact.")

### CONCLUSION

For the reasons stated above, First Specialty's motion for a stay is denied. Restorations' motion to strike portions of the affidavit of Dan Vance relating to settlement negotiations (Docket

No. 36) is granted. All other motions to strike are denied as stated in this opinion. Restoration's motion for summary judgment on estoppel (Docket No. 25) is granted as to the defense of Mr. Koutroumbis, but otherwise denied. Restoration's motion for § 155 sanctions (Docket No. 47) is also denied without prejudice.

ENTER:

Dated: November 30, 2005

REBECCA R. PALLMEYER
United States District Judge